**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**JACQUELINE J. SMITH,**

                                        **Plaintiff,**

        **vs.**                                                    **1:05-CV-1433**
                                                                    **(NAM)**

**MICHAEL J. ASTRUE*,**
**COMMISSIONER OF SOCIAL SECURITY,**

                                        **Defendant.**
_____

**APPEARANCES:**                          **OF COUNSEL:**

Jacqueline J. Smith
c/o D. Hyer
35 Highland Drive
East Greenbush, NY 12061
*Plaintiff Pro Se*

Andrew T. Baxter                          William H. Pease, Esq.
Acting United States Attorney for
the Northern District of New York
P.O. Box 7198-
100 South Clinton Street
Syracuse, New York 13261-7198
and
Office of General Counsel                 Barbara L. Spivak, Esq.
Social Security Administration            Karla J. Gwinn, Esq.
26 Federal Plaza
New York, New York 10278
*Attorneys for Defendant*

        ** On February 12, 2007, Michael J. Astrue was sworn in as Commissioner of the
Social Security Administration.  Pursuant to Federal Rule of Civil Procedure 25(d)(1), he is
automatically substituted for former Commissioner Joanne B. Barnhart as the defendant in this
action.

**Norman A. Mordue, Chief U.S. District Judge:**

                    **MEMORANDUM-DECISION AND ORDER**

**I.       INTRODUCTION**

Plaintiff Jacqueline J. Smith brings the above-captioned action pursuant to 42 U.S.C. § 405(g) of the Social Security Act, seeking review of the Commissioner of Social Security's decision to deny her application for disability insurance benefits ("DIB") and supplemental security income ("SSI").  Presently before the Court are the parties' motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.

## II.    BACKGROUND

Plaintiff was born on January 23, 1961. (Administrative Transcript at p. 31).[1]  Plaintiff is divorced and has 2 daughters, ages 18 and 22. (T. 74).  Plaintiff resides with her mother and her 18 year old daughter.  (T. 74).  Plaintiff completed high school and one year of college. (T. 60). From January 2001 until April 2001, plaintiff was employed as a counter clerk for a dry cleaner. (T. 64).  Plaintiff was responsible for locating clothes and "taking money". (T. 84).  Plaintiff was required to stand for six hours each day and frequently lifted less than 10 pounds. (T. 84).  Prior to working as a dry cleaner clerk, plaintiff was employed as a bakery assistant at a supermarket and a sales clerk at a department store. (T. 65).  Plaintiff claims she became disabled due to heart problems. (T. 11).  The last day plaintiff worked in any capacity was July 15, 2002. (T. 37).


### A.    Plaintiff's Medical Treatment

On April 15, 1999, plaintiff had an initial evaluation as a "new patient" with Dr. Ritchie Parrotta, D.O. at Wyantskill Family Medicine.[2] (T. 163).  Dr. Parrotta noted plaintiff had no

---

[1] Portions of the administrative transcript, Dkt. No. 9, filed by the Commissioner, will be cited herein as "(T___)."

[2] D.O. is an abbreviation for Doctor of Osteopathy. *Dorland's Illustrated Medical Dictionary,* 2140 (31st ed. 2007).  Osteopathy is any disease of a bone. *Id*. at 1368

relevant prior medical or social history. (T. 163). Plaintiff advised Dr. Parrotta that she was taking Buspar and smoked over a pack of cigarettes a day.[3]  Dr. Parrotta noted that plaintiff denied consuming alcohol and that plaintiff was divorced with two children. (T. 163). Plaintiff complained of fatigue and panic attacks and stated she was "having problems with one of her daughters". (T. 163). Upon examination, Dr. Parrotta found plaintiff's heart rate was regular and her lungs were clear. (T. 163). Dr. Parrotta diagnosed plaintiff with mild anemia and depression and prescribed Zoloft, Xanax and Zyrtec.[4]  (T. 163). On April 28, 1999, plaintiff returned for a follow up visit for her anemia and depression. (T. 162). Dr. Parrotta noted plaintiff's depression was "resolving somewhat" however, plaintiff was "sleepy" on Zoloft. (T. 162). Dr. Parrotta advised plaintiff to discontinue taking Zoloft and prescribed Prozac.[5] (T. 162).

Plaintiff followed with Dr. Parrotta every three months until July 2002 for her anemia and depression.[6]  On May 19, 1999, Dr. Parrotta noted "Prozac worked better" and opined that plaintiff's depression was "resolving". (T. 162). On July 15, 1999, Dr. Parrotta noted plaintiff was well-maintained on Prozac and noted her anemia was "resolving". (T. 162). In October and December 1999, Dr. Parrotta noted "depression under control, anemia basically resolved". (T.

---

[3] BuSpar is an antianxiety agent used in the treatment of anxiety disorders and for short-term relief of anxiety symptoms; it is not related chemically or pharmacologically to the benzodiazepines, barbiturates, or other sedative/anxiolytic agents. *Id*. at 269.

[4] Zoloft is a used to treat depression, obsessive-compulsive, and panic disorders. *Id.* at 1724, 2120. Xanax is an antianxiety agent in the treatment of anxiety disorders and panic disorders and for short-term relief of anxiety symptoms. *Dorland's* at 55, 2113. Zyrtec is a nonsedating antihistamine used in treatment of allergic rhinitis and as a treatment adjunct in asthma. *Id*. at 340, 2125.

[5] Prozac is used in the treatment of depression and obsessive-compulsive disorder. *Id.* at 730, 1562.

[6] Dr. Parrotta was plaintiff's primary care physician, therefore, the record includes notes for treatment of other conditions/complaints that are unrelated to the issues at hand. A summary of those visits has been omitted from this discussion.

161).  In March 2000, Dr. Parrotta renewed plaintiff's prescription for Xanax and Prozac and advised plaintiff to consider a psychological evaluation. (T. 161).  In June and September 2000, Dr. Parrotta noted "everything seems to be under control". (T. 160).  In January 2001, plaintiff advised she was having some personal problems and Dr. Parrotta recommended that plaintiff "continue all supportive care". (T. 160).  In March 2001, plaintiff advised that her daughter had been "arrested again".  (T. 159).   Dr. Parrotta diagnosed plaintiff with depression and provided her with a prescription to increase her dosage of Prozac. (T. 159).

In September 2001, plaintiff complained of vision problems.  (T. 159).  Dr. Parrotta advised plaintiff to continue her diet and exercise program and prescribed Glucophage.[7] (T. 159). In February 2002, Dr. Parrotta noted plaintiff was recently diagnosed with diabetes and renewed plaintiff's medications. (T. 157).  On July 10, 2002, Dr. Parrotta noted "depression and anxiety under good control". (T. 157).

On July 15, 2002, plaintiff advised she had chest pain at work without radiating pain or shortness of breath. (T. 157).  Plaintiff had a chest x-ray which was "normal" and Dr. Parrotta advised plaintiff to undergo a stress test and "relax her work ethic". (T. 157).

From September 2002 until April 2003, plaintiff continued to receive treatment from Dr. Parrotta for her diabetes and anemia. (T. 144-145).  During this time, Dr. Parrotta continually noted plaintiff's anemia and diabetes were under control and provided plaintiff with refills for her medications. (T. 144-145).

On October 2, 2003, plaintiff was admitted to Samaritan Hospital. (T. 155).  Upon admission, Dr. Parrotta prepared a History and Physical Report.  (T. 155).  Dr. Parrotta noted that

---

[7] Glucophage is used in the treatment of type 2 diabetes mellitus. *Dorland's* at 801,1163.

plaintiff appeared in the emergency room complaining of shortness of breath and heaviness in her chest. (T. 112).  Dr. Parrotta noted plaintiff had a history of tobacco abuse, diabetes and anemia. (T. 112).  Dr. Parrotta assessed plaintiff with "chest pain, probably non-cardiac in nature and secondary to anxiety and depression". (T. 156).  Dr. Parrotta suggested a cardiac consultation to determine whether a cardiac catheterization was necessary.[8] (T. 156).

On the same day, plaintiff was referred to Dr. Robert Benton, a cardiologist, for a consultation. (T. 121).  Dr. Benton noted that plaintiff presented at Samaritan Hospital with recurrent and prolonged chest pain. (T. 121).  Dr. Benton noted a negative myocardial infarction and enzyme criteria and referred plaintiff for early diagnostic catheterization. (T. 121).    After catheterization, Dr. Benton noted plaintiff exhibited "moderate, non-obstructive coronary artery disease with mild systemic hypertension and a preserved left ventricular function with segmental abnormality".[9] (T. 121).  Dr. Benton recommended "aggressive risk factor modification with strict tobacco abstinence and medical therapy". (T. 121).

Upon discharge from Samaritan Hospital, plaintiff was advised to stop smoking.  (T. 112). Dr. Parrotta noted plaintiff's laboratory work "was all pretty much within normal" and noted that plaintiff's hospital stay was uncomplicated but that plaintiff was "anxious and nervous". (T. 112). Dr. Parrotta recommended aspirin and Lipitor and advised plaintiff to continue her diabetic diet.[10]

---

[8] A cardiac catheterization involves the passage of a small catheter through a vein in an arm or leg or the neck and into the heart, permitting the securing of blood samples, determination of intracardiac pressure, detection of cardiac anomalies, planning of operative approaches, and determination, implementation, or evaluation of appropriate therapy. *Dorland's* at 311.

[9] Mild systemic hypertension is elevation of systemic venous pressure, usually detected by inspection of the jugular veins. *Id.* at 909.

[10] Lipitor is administered orally and used to treat hypercholesterolemia (excessive cholesterol in the blood). *Dorland's* at 175, 1077.

(T. 112).  Dr. Parrotta diagnosed plaintiff with angina, coronary artery disease, diabetes, tobacco

abuse and mild depression with anxiety disorder.[11] (T. 112).

On October 26, 2003, plaintiff returned to the Emergency Room of Samaritan Hospital.

(T. 106).  Plaintiff arrived via ambulance complaining of heaviness in her chest, shortness of

breath and numbness in her head and mouth. (T. 105).  Upon admission, Dr. Parrotta prepared

another History and Physical Report.  (T. 106).  Dr. Parrotta noted plaintiff's medical history of

diabetes, hypertension and anxiety/depression. (T. 106).  Dr. Parrotta also noted plaintiff was not

working and smoked a ½ pack of cigarettes a day. (T. 105).  Dr. Parrotta also stated that plaintiff

had a cardiac catheterization which revealed "a 30 to 40% lesion in one artery" but "otherwise a

pretty normal cardiac catheterization". (T. 106).  Dr. Parrotta noted plaintiff had no history of

myocardial infarction, cardiac arrhythmia, pulmonary complaints, COPD or asthma. (T. 106).  Dr.

Parrotta opined that plaintiff had minimal atherosclerotic heart disease.[12]  (T. 106).

Upon examination, Dr. Parrotta found plaintiff in no acute distress with stable vital signs.

(T. 106).  Dr. Parrotta noted plaintiff was "100% on room air", with clear lungs and a regular

heart rate. (T. 106).  Dr. Parrotta noted plaintiff's CO2 level was low secondary to

hyperventilating and plaintiff's EKG showed a sinus bradycardia but no evidence of acute

changes.[13] (T. 106).  Dr. Parrotta suggested a cardiac and psychiatric consult and noted "the

patient's difficulty is more on a psychological standpoint as opposed to any cardiac standpoint".

---

[11] Angina is any spasmodic, choking, or suffocative pain.  *Id*. at 84.

[12] Atherosclerotic heart disease includes the formation of deposits of yellowish plaques (atheromas) containing cholesterol, lipoid material, and lipophages in the intima and inner media of large and medium-sized arteries.  *Id*. at 174.

[13] Bradycardia is a slowness of the heartbeat, as evidenced by slowing of the pulse rate to less than 60.  *Id*. at 249.

(T. 107).  Dr. Parrotta advised plaintiff to continue with her current medications. (T. 107).

On the same day, a cardiac consultation was performed by Dr. Rafael Papaleo. (T. 108).
Dr. Papaleo noted plaintiff's admitting diagnosis was "chest pains", non-obstructive coronary
artery disease, anxiety disorder and non-insulin dependent diabetes. (T. 108).  Plaintiff advised
Dr. Papaleo that her symptoms resolved once she was helped by EMT's and given oxygen. (T.
108).  Plaintiff advised that she had been admitted to the hospital earlier that month for similar
complaints of chest pains. (T .108).

Upon examination, Dr. Papaleo found plaintiff  "very anxious" with a regular heart
rhythm. (T. 108).  Dr. Papaleo reviewed the EKG and also noted the presence of sinus
bradycardia. (T. 108).  Dr. Papaleo opined that plaintiff's symptoms were atypical for angina and
suggested further evaluation for evidence of reactive airways disease.  (T. 108).  Dr. Papaleo also
noted that "some component of an anxiety disorder needs to be excluded". (T. 108).

On October 27, 2003, Dr. Jose Garcia performed a psychiatric examination of  plaintiff at
the request of Dr. Parrotta. (T. 110).  Dr. Garcia noted plaintiff had a history of depression and
anxiety disorder and complained of being "anxious" without suicidal ideas.  (T. 110).  Dr. Garcia
noted plaintiff had a history of similar complaints for which she had a "work up" five months ago.
(T. 110).  Plaintiff claimed she had a normal stress test. (T. 110).  Dr. Garcia noted plaintiff had
been "in outpatient treatment with the primary care physician".  (T. 110).  Dr. Garcia noted
plaintiff had been taking 20 mg of Prozac and .5 mg of Xanax to control her anxiety. (T. 110).
Plaintiff advised that the medications seemed to work but that perhaps she "needed more". (T.
110).  Dr. Garcia noted plaintiff lived with her mother, was divorced and had two children.  (T.
111).  Plaintiff's 18 year old daughter was in college and her 22 year old daughter was living in

California. (T. 111).  Dr. Garcia noted plaintiff smoked one pack of cigarettes a day but was taking medication to help her decrease her intake. (T. 111).

Upon examination, Dr. Garcia found plaintiff "looked older than her stated age" but was cooperative and pleasant. (T. 111).  Dr. Garcia noted plaintiff's mood was depressed, her affect was labile and speech was normal.  (T. 111).  Plaintiff denied any delusions or hallucinations. (T. 111).  Dr. Garcia found plaintiff's judgment, insight, concentration and attention were "fair". (T. 111).  Dr. Garcia diagnosed plaintiff with depressive disorder, anxiety disorder and noted "rule out panic disorder with agoraphobia"[14]. (T. 111).  Dr. Garcia increased plaintiff's Prozac to 40 mg and prescribed Klonopin.[15]  Dr. Garcia noted that a social worker would schedule an appointment for plaintiff "at Outpatient at Samaritan Hospital".[16]  (T. 111).

On October 28, 2003, plaintiff returned to Dr. Parrotta for an office visit with complaints of extreme anxiety, chest pains and shortness of breath. (T. 144).  Plaintiff advised that she had quit smoking and had recently seen a psychiatrist who prescribed Klonopin. (T. 144).  Dr. Parrotta advised plaintiff to continue taking the Klonopin, to discontinue taking Prozac and prescribed Paxil.[17]  Dr. Parrotta diagnosed plaintiff with panic attacks and noted that he would "see if Dr. Phillips will see her".  (T. 144).  In November 2003, Dr. Parrotta noted plaintiff's anemia and panic attacks were "under better control" and that plaintiff was treating with Dr.

---

[14]  Agoraphobia is an intense, irrational fear of open spaces, characterized by marked fear of venturing out alone or of being in public places.  It may be associated with panic attacks.  *Dorland's* at 41.

[15]  Klonopin is administered orally and used in the treatment of panic disorders.  *Id.* at 379, 1003.

[16]  The record does not contain any treatment notes of any outpatient counseling from Samaritan Hospital.

[17]  Paxil is used to treat depressive, obsessive-compulsive, panic, and social anxiety disorders; administered orally.  *Dorland's* at 1405, 1419.

Phillips and "doing better on Paxil".[18] (T. 144).  In January 2004, Dr. Parrotta noted plaintiff had been to the hospital and was diagnosed with vertigo.[19] (T. 144).  In June and August 2004, plaintiff complained of increased anxiety prompting Dr. Parrotta to provide a new prescription for Xanax. (T. 142).   In September 2004, Dr. Parrotta noted plaintiff had been treated at the emergency room due to elevated blood sugar levels.[20] (T. 141).

On November 7, 2003, plaintiff had a follow up visit with Dr. Benton.  (T. 119).  Upon examination, Dr. Benton noted no exertional chest pain, no palpitations, no cough or wheezing, no nausea or abdominal pain. (T. 119).   Plaintiff underwent a second EKG which was "normal" with normal sinus rhythm, normal axis and normal intervals. (T. 120).  Dr. Benton opined that "many of Jackie's symptoms are related to anxiety". (T. 120).  Dr. Benton further noted that plaintiff needed to stop smoking and "get really serious about her heart disease, which is aggressive, given her age". (T. 120).  Dr. Benton advised plaintiff to continue with her medications which included aspirin, Lipitor, Norvasc, Metoprolol, Klonopin, Paxil, Glucophage and Iron.[21] (T. 119).

On January 7, 2005, plaintiff had a follow up visit with Dr. Parrotta for her anemia and anxiety disorder. (T. 139).  Plaintiff stated she felt "well". (T. 139).  Dr. Parrotta encouraged plaintiff to follow her diabetic diet and explained to plaintiff the "significant consequences of uncontrolled diabetes".  (T. 139).  Dr. Parrotta renewed her prescription for Xanax. (T. 139).

---

[18] There are no treatment notes in the record from Dr. Phillips.

[19] There is no record or treatment notes of this hospital visit.

[20] There is no record or treatment notes of this hospital visit.

[21] Norvasc and Metoprolol are used in the treatment of hypertension and chronic stable angina; administered orally. *Id.* at 64, 1311.

On February 10, 2005, plaintiff advised Dr. Parrotta that she had "not been faithful on her diet" and Dr. Parrotta noted that her diabetes was "under poor control". (T. 139).   Dr. Parrotta insisted plaintiff seek treatment with an endocrinologist and that she start on Insulin. (T. 139).

On February 18, 2005, plaintiff had an x-ray of her chest taken at Samaritan Hospital. (T. 138).  The radiologist found "COPD".[22]  (T. 138).

On August 19, 2005, plaintiff was admitted to the Capital District Psychiatric Center Crisis Intervention Program. (T. 191).  Plaintiff's mother claimed plaintiff was admitted after she was found by police wandering in a neighborhood 25 miles from her home. (T. 192).  On August 20, 2005, plaintiff was discharged and advised to take her medication and follow with her doctor. (T. 191).

## III.   PROCEDURAL HISTORY

Plaintiff protectively filed an application for DIB and SSI on October 21, 2003.  (T. 71). The applications were denied on March 31, 2004.  (T. 17).  Plaintiff requested a hearing before an Administrative Law Judge ("ALJ") but waived her right to appear at the hearing and requested that the case be decided on the written evidence.  (T. 27, 29).  On July 25, 2005, ALJ Robert Wright issued a decision denying plaintiff's claim for benefits.  (T. 10-15).  The Appeals Council denied plaintiff's request for review on September 23, 2005, making the ALJ's decision the final determination of the Commissioner. (T. 2).  This action followed.

---

[22] COPD is chronic obstructive pulmonary disease.  *Dorland's* at 2139.

IV.     **ADMINISTRATIVE LAW JUDGE'S DECISION**

The Social Security Act (the "Act") authorizes payment of disability insurance benefits to individuals with "disabilities."  The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A). There is a five-step analysis for evaluating disability claims:

> "In essence, if the Commissioner determines (1) that the claimant is not working, (2) that he has a 'severe impairment,' (3) that the impairment is not one [listed in Appendix 1 of the regulations] that conclusively requires a determination of disability, and (4) that the claimant is not capable of continuing in his prior type of work, the Commissioner must find him disabled if (5) there is not another type of work the claimant can do." The claimant bears the burden of proof on the first four steps, while the Social Security Administration bears the burden on the last step.

*Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003) (quoting *Draegert v. Barnhart*, 311 F.3d 468, 472 (2d Cir. 2002)); *Shaw v. Chater*, 221 F.3d 126, 132 (2d Cir. 2000) (internal citations omitted).

In this case, the ALJ found at step one that plaintiff had not engaged in gainful activity since the filing date of her application. (T. 11).  At step two, the ALJ concluded that plaintiff suffered from heart disease which qualified as a "severe impairment" within the meaning of the Social Security Regulations (the "Regulations").  (T. 12).  At the third step of the analysis, the ALJ determined that plaintiff's impairment did not meet or equal the severity of any impairment listed in Appendix 1 of the Regulations.  (T. 12).  At the fourth step, the ALJ found that plaintiff had the following residual functional capacity ("RFC"):

> to lift or carry up to 10 pounds frequently or 20 pounds occasionally, and sit, stand, or walk for up to six hours total in an eight hour workday. (T. 13).

The ALJ then found that plaintiff's condition did not prevent her from returning to her past relevant work as a dry cleaner clerk. (T. 13). Therefore, the ALJ concluded that plaintiff was not under a disability as defined by the Social Security Act. (T. 15).

## V.  DISCUSSION

A Commissioner's determination that a claimant is not disabled will be set aside when the factual findings are not supported by "substantial evidence." 42 U.S.C. § 405(g); *see also Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000). Substantial evidence has been interpreted to mean "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* The Court may also set aside the Commissioner's decision when it is based upon legal error. *Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999).

Plaintiff argues: (1) the ALJ failed to sufficiently develop the medical record; (2) the ALJ improperly discounted her mental conditions; and (3) the ALJ failed to properly apply the "treating physician rule" to Dr. Parrotta's opinions. (Dkt. No. 11, p. 2). The Commissioner argues the ALJ properly considered plaintiff's allegations of psychological impairment however, the evidence did not establish that plaintiff suffered from a severe mental health impairment. (Dkt. No. 12, p. 6). Further, the Commissioner asserts that the ALJ's determination is supported by substantial evidence. *Id.*

### A.    ALJ's Duty to Develop Record

Plaintiff argues that her "most serious problem is her mental one" and claims that the ALJ failed to develop her medical record. (Dkt. No. 11, p. 1). Specifically, plaintiff asserts the ALJ failed to obtain plaintiff's medical records from her September 2004 treatment at Samaritan Hospital and her admission to the Capital District Psychiatric Center Crisis Intervention

Program.[23]  *Id.*  The Commissioner does not provide a specific response to this objection.

Given the remedial intent of the Social Security statute and the non-adversarial nature of benefits proceedings, the ALJ has an affirmative duty to develop the medical record if it is incomplete.  *See Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1999) ("Before we make a determination that you are not disabled, we will develop your complete medical history for at least the 12 months preceding the month in which you file your application ....").  Plaintiff has the burden of "provid[ing] medical evidence" to show she is disabled, but the ALJ has a heightened obligation to assist a pro se plaintiff affirmatively in developing the record.  *Carroll v. Secretary of Health and Human Servs.*, 872 F.Supp. 1200, 1204 (E.D.N.Y. 1995); *see also Camacho v. Apfel*, 1999 WL 294731, at *3 (E.D.N.Y. 1999) (citing 20 C.F.R. § 404.1512(c)). This duty is especially heightened where an unrepresented claimant's record is inconsistent or incomplete.  *Hankerson v. Harris*, 636 F.2d 893, 895 (2d Cir. 1980).  When the plaintiff is unassisted by counsel, the ALJ has the duty to scrupulously and conscientiously probe into, inquire of, and explore all the relevant facts.  *Gold v. Secretary of Health, Educ. and Welfare*, 463 F.2d 38, 43 (2d Cir. 1972).  This heightened obligation involves, *inter alia*, the duty to ensure that the claimant secures all of the relevant medical testimony; the duty to call the claimant's physicians to testify; and the duty to instruct the claimant of his right to subpoena and cross-examine physicians.  *Dawson v. Apfel*, 1997 WL 716924, at *7 (S.D.N.Y. 1997); *see also Echevarria v. Secretary of Health and Human Servs.,* 685 F.2d 751, 755 (2d Cir. 1982).

---

[23] Plaintiff argues the record does not include Dr. Parrotta's records. (Dkt. No. 11, p. 1-2).  However, the argument is without merit as Dr. Parrotta's treatment notes are part of the record before this Court. (T. 137-164). With regard to plaintiff's records from Capital District Psychiatric Center, the record contains a one-page report entitled "Discharge Instructions". (T. 191). This record was submitted to the Appeals Council after the ALJ rendered his decision and was incorporated into the record.  (T. 5).

Based on the importance of a treating physician's assessment, the ALJ has an affirmative obligation to obtain more than "sparse notes" in the medical records from a treating physician. *Rosa v. Callahan*, 168 F.3d 72, 79-80 (2d Cir. 1999). In furtherance of the duty to develop the record, the ALJ could re-contact medical sources if the evidence received from the treating physician or other medical sources is inadequate to determine disability and additional information is needed to reach a determination. 20 C.F.R. § 404.1512(e). "Reasonable efforts" in this context includes issuing and enforcing subpoenas requiring the production of evidence, and advising the plaintiff of the importance of the evidence. *Almonte v. Apfel*, 1998 WL 150996, at *7 (S.D.N.Y. 1998). The ALJ must also enter these attempts at evidentiary development into the record. *Id.* In *Peed v. Sullivan*, 778 F.Supp. 1241, 1246 (E.D.N.Y. 1991), the court stated:

> To obtain from a treating physician nothing more than charts and laboratory test results is to undermine the distinctive quality of the treating physician that makes his evidence so much more reliable . . . It is the opinion of the treating physician that is to be sought; it is his opinion as to the existence and severity of a disability that is to be given deference. Thus, when the claimant appears pro se, the combined force of the treating physician rule and of the duty to conduct a searching review requires that the ALJ make every reasonable effort to obtain not merely the medical records of the treating physician but also a report that sets forth the opinion of that treating physician as to the existence, the nature, and the severity of the claimed disability.

Moreover, in *Barnave v. Barnhart*, 2005 WL 1129780, at *6 (E.D.N.Y. 2005), the court discussed the importance of obtaining not merely medical records from a treating physician, but also a report that sets forth the opinion of that treating physician. In *Barnave*, the plaintiff waived his right to appear at an administrative hearing and refused to submit to a psychiatric consultative evaluation. *Id.* at *1-2. The ALJ's determination was based upon the evidence and the plaintiff's refusal to submit to a consultative examination. *Id*. at *3. The Court found that substantial evidence did not support the Commissioner's determination that there was no medical evidence to

14

substantiate a severe mental or psychiatric impairment.  *Id.* at *4.  The Court remanded for further

development of the evidence and stated:

> The ALJ's rejection of Barnave's claim for benefits . . . was based largely on the
> absence of a complete psychiatric assessment, a deficiency that exists because
> Barnave adamantly refuses even to visit a consultative examiner who would provide
> such an assessment.  That outcome, while understandable, is inconsistent with the
> beneficent goals of the program administered by the Commission.  Especially where
> the claimant's uncooperativeness arises in the context of an apparent mental
> impairment, a greater effort to develop the record is necessary before the ALJ can
> properly close the door to benefits.

*Barnave*, 2005 WL 1129870, at *9.

In this case, the ALJ acknowledged that "[t]he medical evidence is sparse in this case, due

in part to the claimant's non-cooperation with a consultative medical examination."  (T. 13).  The

ALJ acknowledged Dr. Parrotta as plaintiff's "treating physician" but the ALJ failed to

summarize or discuss Dr. Parrotta's six year treatment of plaintiff.  The ALJ only stated that

"claimant has been prescribed Xanax and Prozac by her primary care physician". (T. 12).  The

ALJ did not analyze or reference Dr. Parrotta's conclusions or assessments.[24]  The ALJ simply

concluded: "[t]he available evidence in the record is not sufficient to establish the existence of

'severe' mental health impairments". (T. 12).

Upon a thorough review of the record, the Court concludes that the ALJ failed to

adequately develop the facts.   Dr. Parrotta's notes indicated that plaintiff was admitted to the

hospital in January 2004 and September 2004. (T. 141, 144).  Dr. Parrotta also noted that plaintiff

received treatment for her mental impairments from Dr. Phillips. (T. 144).  The ALJ did not

address the 2004 hospital admissions or Dr. Phillips's treatment.  As the plaintiff was not

---

[24] The ALJ discussed Dr. Garcia's opinions however, Dr. Garcia examined plaintiff on one occasion and
therefore, was not a treating source.  *See* 20 C.F.R.§ 404.1502; *see also Schisler v. Bowen,* 851 F.2d 43, 45 (2d Cir.
1988) (finding that a physician who had only seen a plaintiff on two occasions was not a treating physician).

represented by counsel, it was incumbent upon the ALJ to encourage plaintiff to provide all of the records of her hospital admissions and her medical records from Dr. Phillips.  In the alternative, the ALJ should have attempted to obtain the medical records directly from the providers.

Moreover, while the record contains Dr. Parrotta's treatment notes, none of plaintiff's treating sources submitted any findings on plaintiff's residual functional capacity.  Given the inadequacy of the record, the ALJ should have sought Dr. Parrotta's opinions.  *See Peed*, 778 F.Supp. at 1246.  The record reveals that the ALJ made no attempt to obtain the opinions of Dr. Parrotta or any other treating physicians by way of letters requesting the information nor by subpoena.  *See Gray v. Astrue*, 2007 WL 2874049, at *6-7 (S.D.N.Y. Oct. 3, 2007).  In order to adequately develop the record, the ALJ should have attempted to contact Dr. Parrotta and/or Dr. Phillips to obtain plaintiff's complete medical records and the doctors' opinions regarding plaintiff's claimed mental impairments.

The record is also incomplete with regard to plaintiff's treatment at Capital District Psychiatric Center.  In August 2005, after the ALJ rendered his decision, plaintiff was admitted to the Capital District Psychiatric Center. (T. 191).  At plaintiff's request, the Appeals Council incorporated a one-page report from the Psychiatric Center entitled  "Discharge Instructions" into the record.  (T. 5).  The additional evidence received by the Appeals Council becomes part of the administrative record and is properly reviewed by this Court.  *Fernandez v. Apfel*, 1999 WL 1129056, at *3 (E.D.N.Y. 1999) (citing *Schaal v. Apfel*, 134 F.3d 496, 505, n. 8 (2d Cir. 1998)).  Other than the one page report, the record is devoid of any admission notes or treatment records from the Psychiatric Center.  To adequately develop the record, the ALJ must attempt to obtain plaintiff's complete medical records from the Psychiatric Center.

16

Accordingly, on remand, the ALJ must further develop the record concerning plaintiff's treatment for her alleged mental impairments. Toward this end, the ALJ should make all reasonable efforts to obtain updated treatment records, a statement from plaintiff's treating source about plaintiff's abilities, and to otherwise adequately complete the record. *Rosado v. Barnhart*, 290 F.Supp.2d 431, 442 (S.D.N.Y. 2003).

### B.   Severity of Mental Health Impairments

Plaintiff asserts that Dr. Parrotta's records provide sufficient evidence of a "serious mental condition" and that her ongoing use of anti-depressants and anti-anxiety medications impacts her ability to perform meaningful work. (Dkt. No. 11, p. 2). As stated, the Court has determined that the ALJ did not adequately develop the medical record in regard to plaintiff's mental health impairments. In light of the foregoing, the Court finds that the ALJ's determination that plaintiff did not suffer from mental health impairments is not supported by substantial evidence. Accordingly, this matter must be remanded for a proper determination of the severity of plaintiff's mental impairments.

### C.   Treating Physician Rule

Plaintiff also asserts that Dr. Parrotta was the only doctor that treated her psychological conditions "with any regularity" and therefore, Dr. Parrotta's opinions are controlling.[25] (Dkt. No. 11, p. 2). As the ALJ failed to fully develop the record, the Court cannot determine whether or not Dr. Parrotta expressed any opinions or if such opinions were well supported and consistent with other evidence in the record. *See* 20 C.F.R. § 404.1527(d)(2). Therefore, the Court is unable to determine whether or not Dr. Parrotta's opinions are entitled to controlling weight. *Id*.;

---

[25] Plaintiff does not specifically evoke the "treating physician rule" however, the Court infers plaintiff's objection from the arguments raised in plaintiff's brief.

*see also* 20 C.F.R. § 416. 927(d)(2).

**VI.    CONCLUSION**

Based upon the foregoing, it is hereby

**ORDERED** that the decision denying disability benefits is **REVERSED** and this matter be **REMANDED** to the Commissioner, pursuant to 42 U.S.C. § 405(g) for further proceedings consistent with this Order, and it is further

**ORDERED** that pursuant to General Order # 32, the parties are advised that the referral to a Magistrate Judge as provided for under Local Rule 72.3 has been rescinded, as such, any appeal taken from this Order will be to the Court of Appeals for the Second Circuit; and it is further

**ORDERED** that the Clerk of Court enter judgment in this case.

**IT IS SO ORDERED.**

Dated:        September 30, 2008
              Syracuse, New York

_____
Norman A. Mordue
Chief United States District Court Judge

18